We apologize for the delay. We have had some extensive arguments this morning, and so we know you were scheduled for 1130, and we're glad that you could persist. All right, Mr Compton. Appreciate the opportunity for oral arguments in this case that's factually simple but legally fascinating, because it deals with scope of agency. First, on a volunteer, which is unusual, and second, it relates to conduct that otherwise we would all engage in greetings, hugs, embraces, handshakes. And in this case, the Crystal Lake Jaycees are saddled with a verdict that arises out of a hug. And the question is, first, even accepting all the evidence that the court heard, is there any nexus between the hug sufficient to make this something that the Crystal Lake Jaycees should answer for? There's two cases that you can really look at that are the latest from the Supreme Court that don't deal with a frolic and detour, and that's Pine v. Whitmer was a frolic and detour case, so I don't see that that's really helpful. But Badgen v. Blessingport and Adames v. Sheehan, and Badgen was interesting because, of course, it says that employees can be held responsible for negligent, willful, and intentional acts. That's the black-letter law, but our analysis here is whether, in this case, the Crystal Lake Jaycees have or should answer for a hug. And Badgen said, here's the question. Is this a loss resulting from the employee's acts that should just be considered one of the normal risks to be borne by an employer? And I think, in this case, the answer should be no. When you meet a person who could be another member, you must hug them. As a matter of fact, the evidence is exactly to the contrary. Noni Valicente, the plaintiff's sister, testified that it behooved the Jaycees to have a loving, warm, embracing culture. And if you look at the cross-examination, although there's some hemming and hawing, when asked, is there a requirement that any Jaycee hug, the answer is absolutely not. Is there a requirement that they engage in an embrace or even a handshake? And she admitted that some Jaycees go through their entire career without any physical embrace or handshake, while others will embrace or shake hands. And so it, I think, takes it beyond an issue of scope of employment, and it just says, is this person engaging in social activity? And if any engaging in social activity under the test the plaintiff posits becomes the responsibility of the employer, then the exposure of employers is virtually unlimited. And I think probably a case I should have spent more time on, but didn't, so we're under the gun, there's all kinds of good things you can find, is the Illinois 2nd District case of Newley. And that was the case, you'll recall, where an employer said to their employees, put these stickers on your truck, and therefore everywhere you go you're acting on behalf of the employer because you're advertising. It's like Gary Glenn Ross, always be closing. And the court said, wait a minute, at some point there is such an insufficient nexus between the conduct alleged and any goal of the employer or the organization that we're not going to find liability, and the 2nd District in that case said, we're not going to find any liability. Wasn't that a pre-badged case? That was a pre-badged case. And doesn't badgent incorporate the three steps which are required in order to prove unfairness liability? Absolutely it does. And you have to have all three. And the argument, though, what's interesting is this recruiting argument that the plaintiff makes is similar to the advertising made in Newley, though, to say that there's some connection here between the hugging and the goals of the JCs. The goals of the JCs very clearly were to run a gear tent, and the uncontradicted testimony was that Mr. Brinkman was a server or a pourer. A pourer or a server, there was some difference of opinion whether he was, but everybody agreed he was not there to recruit. So the fallback position is, well, we're always friendly at these things, and therefore we're always recruiting, and I think that the cases with regard to volunteers tell this court that every organization, every business you tell your secretary, be pleasant to people. If you have a social organization, there's going to be hugs, there's going to be handshakes. Is that the purpose that he was employed for, or is that the purpose that he was there for, and was he acting to further the purposes of the organization? The people who are manning this beer tent, at least it appears from the evidence, that they had a uniform. They had a shirt. They had a shirt. That probably said Crystal Lake JCs or something. Yeah, I think it said Octoberfest. So was that shirt, and that's what I'm not clear about, is that shirt something that was given to everybody who volunteered at the, because this is a volunteer entity, it's a volunteer activity, or was this a JC shirt given to the people that volunteered for them? You know what, Your Honor, that's a great question. It's not a question that came up at trial. I know there was testimony that it was given to every JC, but whether it was given to the man or volunteers or not. To the First Methodist Church who is serving this or something like that. I cannot tell you. Thank you. I cannot tell you. So the problem, though, is not only is this such a contingent activity, not only is it so little related as to be only ancillary to the activities of the JCs, which was running a beer tent. The other question is, do we even get there when you ask, what is Mr. Brinkman's motive in providing this embrace? His desire. His desire. Now, sometimes, as with the Adams case, and in Adams v. Sheehan, they looked at an earlier handgun case. Both cases were law enforcement that stored their pistols. But they had the law enforcement individuals there, and they said, why did you do it? What was it there for? And in Adams, I wish I knew really how to pronounce that. In that case, the officer said, well, I didn't have to carry a gun, and I didn't have it for an emergency, and I didn't have to pull it out. I was expected to dial 911 if something happened. So you had facts that could lead you to motive there beyond the fact that he held this gun, and he was trained, and he was required to store it, and he could be disciplined for not storing it. And still, the Supreme Court said, not good enough in your case. Now, did Brinkman testify in this case? Brinkman did not testify in this case. So maybe we would have been in a different place, like in Adams or Damas, whatever you say, where the defendant says, I wasn't required to carry a gun for my work. His employer said, we didn't require him to carry a gun. If he had a gun, he had it for his own purpose. Therefore, he could store it however he'd like. We didn't have Brinkman testify and say, and I know it's not his burden, but unlike that Supreme Court case, we didn't have the defendant say, nobody told me to hug. I was hugging because I just like to hug. Correct? And that is absolutely correct. And it's very clear that it's also the plaintiff's burden. Right. There's no question. And if you don't have any fact, and we cited to the testimony relating to the hug, did Mr. Brinkman say anything to you? Welcome to the Jaycees, or I'm glad you're volunteering. According to the plaintiff, he said, am I your light? At what point did the plaintiff bring forth that it was the Jaycees' custom to hug? Well, the first time it was mentioned, in my opinion, was during opening statements. The first time it was brought forth was during the first witness, and that's where we get to the second part of this case, and that was the trial court error in the 213. And I'm happy to go there if you all would like to go there. I don't think you have to get there, though, because you are left to speculate. When the only testimony is the Crystal Lake Jaycees is a close-knit organization, therefore, we encourage hugging and greeting as recruiting. When that is so little, when it's so attenuated and so little related to the purpose of the Jaycees and why Mr. Brinkman was there, a person who was not to recruit, then you have to ask yourself, well, wouldn't it be nice if there was some testimony surrounding this hug, and Mr. Whitman testified that the plaintiff admitted immediately after the hug that Mr. Brinkman said, I haven't seen you in a long time. So there's nothing but speculation to make a Jaycee hug, even if such a thing exists, and I don't think it does, to make that motivation rise to the fore. But should this, under badgent, should this even be a bit more focused in that Mr. Brinkman's job that night was to serve or pour beer? Correct. Did this hug in any way relate to serving or pouring beer? Or can we look at it as I think the plaintiff would like us to look at it as when you're doing anything as a Jaycee, you're there to serve the community and recruit members into the organization. So is that his job that night? So what are we looking at, the narrow focus or the overall reason for the Jaycees? Well, I think if you were to say that any time a Jaycee is doing what a Jaycee does, the Jaycee's conduct leads to respondeat liability, then you may as well throw the three-step process in this case out the window. And all you have to do is take a look at Adams v. Sheehan and look at the fact that this man had a pistol because he was once required to carry it, and he stored it in his home, and he could be disciplined by the sheriff for failure to store. And he had to qualify with a pistol annually, but he was not required to carry it in the course of his employment. He was not required to be accessible for an emergency. So if you were just to back up and take the broad focus in Adams, the Supreme Court would have answered the question exactly the opposite and said, well, he's obviously had that done because he used to carry it, he still qualifies. In the broad focus, we find it's related. So if you are to back up enough, you will find anything is related to the employment and the task. But I think the second part, and that's why I think the case with the stickers on the truck is so instructive, because if you back up enough, any time I'm driving a truck with stickers that say Compton Law Group and have a gavel up on top of my roof, I could be saying to serve some overall purpose to generate business or to increase goodwill or to advertise my services. But the courts put a stop to that with a three-step analysis and say, is there really, is this an activity of the kind he was hired to do? That's the one step. Was it within the time and place of his employment? There's no argument here that that's the case. And then the third step, was it actuated, at least in part, by a desire to serve the master? And that's where you veer over to speculation because it's not a J.C. handshake, it's not a J.C. hug. There's no requirement that J.C.s hug. And as Nona Valicente said, you could go your entire life without hugging anybody. Particularly with a service organization, though, that you're trying at all times to put on a positive face, you're at all times trying to encourage new members to join and so forth. Isn't there kind of this continuum where, on the one hand, if he had left the beer tent and saw her and just started swearing at her, whatever you're doing here, that's not going to encourage new members to join and be a nice, warm, welcoming atmosphere. On the other hand, he expresses a lot of emotion to her and hugs her and says, hey, this is great that you're here and so forth. At some point, there's a continuum there, right? And at some point, his conduct falls on that continuum. So where is it that that conduct, you can say, is, I don't think the time and place is an issue at all. The time and place, he's there. But where is it, along that continuum, that you can say that his conduct is motivated, partly or wholly, to serve the organization? Well, you could say that, for example, and the testimony was that they do have recruiters and they do have recruitment tables. They do have people that are in charge of volunteers. Or you could perhaps have called Dennis Brinkman and said, were you trying to welcome her to the Jaycees? Was that the reason of the hug? Or was it just because she was your buddy? And we don't have that, and it's not my burden to show that. And if I'm out of time, that's fine. Well, we've given everybody extra time today, so we'll give each of you a little extra time as well. I think the end of our discussion right now highlights the trial court error. And I went to pains to explain a confusing situation, no doubt, but why I think the trial court was confused. But it also highlights, if you think I'm full of hot air in my argument that I'm entitled to a JNOV, and people have various opinions on that, the whole argument about whether I'm entitled to judgment notwithstanding the verdict, you finally get to a place that Justice Spence asked, and that is, well, you know, where on the continuum does this fall? Now, the judge allowed, without any 213 disclosure, facts regarding the Jaycees' motive in hugging, facts regarding how they recruited and how they encouraged it, and at the same time said, we're not going to let you get into the Jaycees' instructions to Mr. Brinkman. So I don't think you get to that. But if you do, you look at Badgent, and it says, in an other, this is the Supreme Court, in an otherwise doubtful case, whether the act of the employee is incidental to the employment, the employer's prohibition accentuates the limits of the employee's permissible action, and hence supports a finding that the prohibited act is entirely beyond the scope of employment. Isn't the record pretty messy on that whole thing? I mean, I was awfully confused, because it appeared to me that the defense actually objected to that coming in at one point. This case has everything. It had a 308 appeal. It had a previous attorney that died. It had Mr. Brinkman being voluntarily dismissed, and it was messy, and that's why I tried to attach in my appendix some of the transcripts showing both the trial court's confusion and why I spent such time in specificity. On January 11th, while Mr. Brinkman was still in the case, he brought this action saying, numbers one through nine, Your Honor, you should bar him from motion to eliminate. It wasn't even subject to trial. They weren't even climbing up on trial. The judge barred those matters, and as I recall, I think Crystal Lake, J.C., said, yeah, we agree. Right. The important thing is two things to remember. At that time, there was a count for wrongful employment that said, hey, you knew about all Brinkman's conduct, and yet you employed him anyway. So the issues are different once the plaintiff dismisses his wrongful employment count. Now, in June, the plaintiff came back in and said, Judge, give me these three things, the hugging by Brinkman, a couple other things. The plaintiff said, reverse your order, and the court reversed his order, and you'll see in my brief it was 7-8-9. The court said, fair game. And it stayed like that for another two years until the eve of trial. When we first did motions in limine in August, I did have a motion in limine saying, I think you should bar 7-8-9. The judge reserved on that issue. We came back in September. The plaintiff dropped his wrongful employment count, and I never pursued my motion. But the plaintiff is the one that said, we don't want any reprimands or previous conduct of Brinkman. All that merely goes to show that if he had disclosed his 213 theory that we encouraged hugs, first of all, we wouldn't have. Well, the complaint, did the complaint allege hugs, or did the complaint allege manhandling? The complaint did not allege hugs. If you look at his alleged assault, alleged picked him up, dropped her, the complaint doesn't use the word hug. The plaintiff's deposition, I don't think, uses the word hug. It certainly doesn't use recruit. So, and I don't blame, this is such an old case, and the file was so thick, and summary judgment was granted and then vacated. Motions in limine were filed years before trial, and motions to reconsider the motions in limine were filed. So, I don't blame the court for being confused. Well, you gentlemen didn't help out, that's for sure. Well, when I tried, it was, as the trial attorney, I can tell you, I was baffled by the court's confusion because he kept saying, I barred it. And I kept thinking, no, I didn't bar it, I don't think I barred it. And when I finally was able to go through the appellate record with a fine-tooth comb, I could see what happened, and I can understand why it was barred. But nonetheless, during the course of trial, when evidence changes, the trial court had to reconsider and say, all right, once I allow the plaintiff to pursue a theory that Crystal Lake Jaycees encouraged these hugs, leading to liability, certainly the defendant is prejudiced if he can't ask the person in charge, didn't you tell Brinkman not to touch anybody? And that's what the quote from Blessing v. Badging Care is all about. So, if you have any other questions, I'm happy to address them on preserving the record or anything else in my brief. I'm happy to address your honors. Okay. You'll have an opportunity for rebuttal if you choose. Thank you. And Mr. Volk? Would you just give me one second? No problem. All right. One second before we start asking you questions. I'm here to answer. Let me just start off by stating that a general observation with respect to my worthy opponent here. In my opinion, he has argued the evidence for the last 20 minutes or so, as he saw it, as he argued at trial. But the difference here is the evidence in this procedure has to be viewed completely and totally in favor of the plaintiff, okay? His theories, his points to the case, for example, he says that Huggs was only ancillary to the proceedings. That is absolutely, unequivocally incorrect. Mr. Volk, let me ask you. You filed a complaint. In the complaint, you never used the word Hugg. You used the word manhandled or picked up. So if we want to follow your theory of the case now that the JCs encouraged Huggs, was this a hug or was it a pick up and a manhandle, as you alleged in your complaint? Well, the complaint alleges he picked her up and put her on the ground. That's what the evidence showed. Was that what was that? We called it a hug. It's a hug. Was that something that the JCs encouraged? Absolutely. And let me just start off by saying, again, the testimony from Penny Parks was that Brinkman hugged her in the same manner as all other JCs greeted her, contrary to what counsel just said. You know, this wasn't any different. That's the evidence that we have here. Well, all other, but she was, I mean, as all other greeted her, but has she greeted every JCs in the world? Well, the evidence in this case, Your Honor, was that the JCs promoted, fostered, encouraged hugging. The testimony was, and this has to be accepted, that the core values, the whole JCs, the founding principle, they got into the history of the starting of this organization. They felt, the founding member, the person who started this felt camaraderie, warm feelings, bonding amongst members promotes better and more good deeds in the community. That's evidence that has to be accepted. Isn't there a difference between hugging and picking a person up and putting them on your shoulder? Isn't that actually two different things that we're talking about here? Again, I think it's more a matter of semantics. I mean, when he hugged her, he hugged her, he put his arms around her, and he lifted her off the ground, and he threw her to the ground. Well, I don't pick somebody up and hug. I don't hug somebody and put them on my shoulder, though. Well, again, Mr. Brickman was negligent in the manner he hugged Penny Parks. That's the whole reason we're here. There's no question. But was his negligent behavior, conduct that his employer wanted him to perform, was a conduct that he did in order to serve his master? A hug? Maybe. A pick up, put on the shoulder, and drop. Was that conduct to serve the master? And was that conduct, the hug, alleged in the complaint? I believe it was alleged in the fact that he picked her up and put her on the ground. Again, the word hug, obviously, I can't say it was used in the complaint. But, again, the complaint has to allege facts that we allege that he picked her up, we allege that he was working at the time, we allege that she was an agent at the time, and that he negligently hugged her. Okay? That's what the crux of the complaint is. He negligently hugged her. Nobody authorized. Conduct doesn't have to be authorized. In Bonham, the employee punched a guy in the face. In Sonseri, the employee bit a guy's ear off. Nobody authorized. Nobody said, go bite this guy's ear off. The issue was, was part of that. And all it has to be is a part. No. In part, moment. That's pre-badged. It has to be a part. Doesn't badgent say you meet all three requirements? Was the conduct of the servant the kind that he is ordinarily employed to perform? Did it occur within the time, place of employment? And was the conduct motivated in whole or in part to serve the employer? All three of those now, based upon badgent, a Supreme Court case, you have to prove all three of those. And the cases you're citing, counsel, are pre-badged cases. Well, I would agree. Obviously, badgent says all three have to be proved. Correct. So tell us how you proved all three in this case. Absolutely. And let me just, I'm going to get to that. Let me just say as far as badgent, badgent didn't overrule or supersede prior decisions. If you look at badgent, it quotes in detail the Pine decision with approval. Now, as far as how these elements were proved, we can go right through badgent. The first element, well. And you have to prove all three. Exactly. The conduct, there's only two that are in dispute here. Time and place. Time and place they've acknowledged, okay? The agent was motivated at least in part. Here's the testimony that is accepted, again. Penn and Parks. And I think this is the best. This is Ann Brophy. This is a picture that was admitted into evidence. This is a past president of the Jaycees. This is taken while both of them are on duty. This is a non-posed photograph. This wasn't you guys hug and we're going to take a picture. This is what they were doing at the October theft five minutes before Penny Parks was hugged by Brinkman and five feet from where Penny Parks was hugged by Brinkman. This is what the Jaycees do. She's not on her shoulder in that picture, right? I understand. But, again, that's why she wasn't hurt. You know, obviously, again, the Jaycees didn't have a policy. We want you to pick people up and throw them to the ground and severely injure them. But I don't think the law requires us to prove that their specific policy was we want you to negligently hug somebody. The point is the evidence was that from the time this organization was started, they promoted, fostered, and encouraged hugging as a way that they felt further strengthened their organization. They were told at all times they want the public to see the good feelings we have and we promote. That helps their organization. So that shows how this was at least in part part of the organizational goals. Now, as far as the motivation for Brinkman, again, we don't have to prove that his sole motivation was to promote the Jaycees. We just have to show it was in part. And the testimony from Ann Brophy herself was I don't he's at best an acquaintance, Brinkman. I hugged him myself because that's what we do. We hug. The testimony from Penny Parks is that she barely knew Dennis Brinkman. And the testimony from her was that the only reason, the sole and only reason Brinkman hugged her, and the sole and only reason that she accepted his hug is because it was fostering and promoting the goals, the policies, and the purposes of the Jaycees. That's the evidence that the jury heard. Now, Mr. Compton argued that's not what the evidence said, but that's what the witnesses said, and that's what the jury accepted. They were asked three separate special interrogatories that tracked badging almost to the letter, and they unequivocally agreed that the evidence proved all three of those elements. And, again, if you look at it in our favor, as I kind of discussed here and is clearly set forth in my brief, there is testimony, and Judge Meyer agreed, there is testimony that, if accepted, shows every single element of badging. And Judge Meyer was correct. He sat there. He listened to all the witnesses. He saw all the witnesses. He heard Mr. Compton cross-examine the witnesses. He believes, and we certainly agree with him, that there was enough evidence on every single element for the jury to decide this case. This is what they do. This is how their organization grows. This is how their organization benefits. His task that night was to pour beer, correct? Well, there was evidence that you were to promote the Jaycees at all times. Okay? Who testified to that? Nonnie Villacenti and Penny Parks. Nonnie Villacenti was in charge of this event. She supervised him. She assigned his work. She said at all times you were to be furthering the interest of the Jaycees when you are on duty. Who told him that night not to hug anybody, don't touch anybody? Excuse me? Who told him not to touch anybody? I believe Nonnie Villacenti told him that. So she told him your job is to promote the Jaycees by hugging, but then she told him don't touch anybody. Well, again, I think the context of how that came up, there was a particular individual that was ill and did not, if you look at the actual testimony, was ill and did not want Brinkman, who was known to the Jaycees, to get drunk at these events and hug people at these events and to touch people at these events. And that person came up to Nonnie and said, found out Brinkman was working and said, hey, can you tell him not to touch me? There wasn't a blanket, you know, we don't want anybody, any of our beer servers not touching anybody. Okay? But when Villacenti got the volunteers together and gave her pep talk, she said, you know, at all times you are a Jaycee, you are important to this organization, we are important to the city, we want you to portray that. She didn't say go out and hug everybody, did she? No, but again, when she gave the pep talk, she didn't. But again, remember, she testified that from the minute she joined this organization right up until the time Mr. Brinkman injured Penny, it was fostered, promoted, and encouraged. That's the evidence in this case. Okay? They don't have to say go out. If for 20 years, Brinkman, or 25 years, people have been telling Brinkman, we want you to be friendly, we want you to go out and show the public that we are a friendly collegial group, we want you to bond with your members because bonding with the members will help us do good deeds in the future. But tonight, we don't want you touching anybody. Well, that's correct. But again, the law doesn't say, or the law says you can still be responsible for a criminal or an unauthorized act. So just because he was told don't hug her, that does not take him out of his agency. In your picture, the two people are reciprocating, or appear to be reciprocating in the hug. Did Ms. Parks reciprocate in the hug? She said she accepted the hug. She said she had her arms by her side and she accepted the hug. And again, importantly, she said... Well, how is she not going to accept the hug? I mean, I don't... Well, sure, you could push somebody away. You could say don't do that. I mean, there's a lot of ways you could. But the testimony was I accepted this hug. That's the testimony in this case. Getting back to those three factors in badging, one of those factors being was the conduct of the servant, the kind that he's ordinarily employed to perform. If he is specifically told to not do something, does that take it out of that first category then? Was the conduct the kind that he is ordinarily employed to perform if you're told, hey, don't do that? No. And again, as I stated, the law is clear. Unauthorized even criminal conduct can still give rise to agency. This is according to the evidence. An organization for years and years and years has promoted and encouraged Brinkman to hug people. Now, so he goes and he does exactly what for 25 years they've been telling him to do. But he's told not to do that night. Well, I mean, he was told that. But again, that doesn't mean every hug he does. The reason he hugged, again, the evidence says the only reason Brinkman hugged him, this is Penny Parks, the only reason Brinkman hugged him and the only reason, importantly, that she accepted the hug was because of the J.C.'s promotion, encouragement and fostering of this hug. So that is why this hug took place. And the fact that he was told not to, again, that does not take it as a matter of law from the jury's hand. And counsel stated that the Newell case was so dispositive because he said that the placard on the sign was not closely associated with the business. But the fact is that had nothing to do with the ruling. The court in Newell ruled that Newell provided no evidence to show an issue of material fact whether he was acting within the time and space limits of his employment. So if Penny Parks had seen Brinkman at a non-J.C.'s event and Brinkman went up to basically a stranger and hugged her because they're both J.C.'s, again, his hug would be motivated in part because of his affiliation with the J.C.'s, but there wouldn't be responsibility because of the time and space requirement. That's the significance of the three-part test. And that's why Mr. Compton's so-called fears really are unfounded. He was in an area restricted to J.C.'s only. He was doing something that all the other J.C.'s do, that all the other J.C.'s promote, and he did it negligently. If he was a Walmart greeter and his neighbor walked in and he was told ahead of time, hey, you've got a tough handshake. We don't want you shaking anybody's hand. And his neighbor walks in and he says, hi, Bob, and he grabs his hand and knocks him to the ground. The fact that his supervisor said, hey, your grip is too tight. Don't be shaking anybody's hand today. That would not take him out of agency because, again, part of his purpose, part of what Walmart greeters do, they're encouraged, they're fostered to be friendly. So he would clearly be responsible in that regard. I suspect my time is going to run out. Again, I'm going to address the 213 issue very briefly, and it's all set forth in my brief. The bottom line is that Judge Meyer ruled they waived that issue. That's a decision by Judge Meyer, and they have to show he abused his discretion. They have not done that. In fact, they don't even argue in their appellant brief that there was an abuse of discretion, and so it's waived on appeal as well. And the simple fact is that if you look at the evidence, Judge Meyer, he specifically stated you never made a 213 objection as to this hugs as a theory issue. That's in the record on page 651. How about the motion in Lemonade with respect to he was told not to hug anybody or touch anybody that night? Yeah, and that's a good question. You know, Mr. Compton got into this case very late. And the fact is that early on in this litigation, all sorts of evidence of bad conduct by Dennis Brinkman came out. That's detailed in the record. He's drinking. He flirted. He did all sorts of prior bad acts. And early on in this case, the Jaycees made a tactical decision that they did not want the jury to hear evidence of all these bad acts by Dennis Brinkman. And the Jaycees and Dennis Brinkman, they filed a motion in January of 2011 seeking to bar all this conduct. That was their motion that we vigorously opposed. That was when Brinkman was still in the case. That's correct. We then subsequently filed a motion to vacate everything, not just three parts of it, everything. We fought to put all of it into evidence. But the fact is, Judge Meyer, he only partially vacated. If you look in the record, his rationale is very clear. He only vacated part of that order. And even then he said, I'm not saying this is getting into evidence. I'm just going to vacate it for now. Then we get to trial. And now Mr. Compton's involved. Mr. Compton filed a motion in limine that said we want to bar the jury from hearing any evidence of any reprimand of Dennis Brinkman. That's his motion. Our position from the start, and this isn't my opinion. This is Judge Meyer when he gave his rationale for his ruling. Our position was everything comes in or nothing should come in. Mr. Compton, after almost all of the stuff was kept out, and rightly so. The JCs don't want evidence that this guy they're throwing out there is getting drunk and they repeatedly employ him at these events. And he's hugging people, he's mauling people, whatever you want to call it. There's all sorts of bad conduct. They wanted that out. Then they come in and they say, we don't even want evidence of reprimand. And then the bottom line is, in the middle of trial, after we've put on our witnesses, after we've based our trial strategy on all of this evidence staying out, he wants this one little warning to come into evidence. And Judge Meyer, again this isn't my opinion, Judge Meyer ruled it's not fair in the middle of trial to allow this one little warning to come in because it is completely out of context unless all the other bad stuff comes in. And again, you have to find, he gave a very reasoned decision and he's absolutely correct. But he missed the primary point that Mr. Brinkman is no longer a party in this case and this is not against Mr. Brinkman. This is to establish that although they may have this goal to do good deeds in the community, he was told that night not to do it because somebody was injured. That's correct. And therefore, how could there be an agency? They kept that out of evidence, though, Your Honor. They filed a motion, years and years ago, they said we want all that. Right, but then they moved to put it in. They never vacated it. The order was still in effect when we started opening statements, when we put on our witnesses. In fact, they got a new order that says borrow all evidence of reprimands. If we had put that in, they would have gotten up at the first witness. We said, we asked them. Now, Mr. Brinkman was told not to hug anybody. Mr. Compton could have got up and jumped the gun and said, wait a minute, Judge, they just violated motion eliminate number 17, defendant. That wasn't a reprimand. He was told something. A reprimand is if you, I'm going to punish you for something. A reprimand is a warning or a caution not to do something. That's what I cited the dictionary definition of it. And if you couple that again, the fact is all of this bad acts was barred, not just as to Brinkman, but it was a motion that the JCs filed. They argued vigorously. They want to keep all this stuff out. And Judge Meyer, he ruled it's not fair to just put this one little piece of the puzzle in without otherwise. It looks like. That there's no policy. It goes to the evidence of whether there is this policy, this policy. No, we have to show why on this particular night. They told him not to hug anybody and why it's still just a slight deviation from his course of employment. If we don't get all this other bad accident, which they fought and did keep out of evidence. Then we are unfairly prejudiced by just letting this warning in. They kept it out. Judge Meyer ruled that he reasoned with it. And again, the law says he can only be overturned if no reasonable person could reach that same result. And again, I think the record is clear that Judge Meyer made a reasoned decision and did not abuse his discretion. And I appreciate your indulging me going over time. Certainly, if you have any questions. The only thing I would say is, again, I think it's important to understand that. This case, when we look at the evidence in terms of the plaintiff. The only reason Brinkman hugged her and the only reason she would accept this hug is because hugging was encouraged by the Jaycees, promoted, fostered by the Jaycees. And I understand this is an unusual fact pattern, but we see that every day. Truth is stranger than fiction. The bottom line is, Judge Meyer correctly ruled that the evidence, and especially now when we look at it in our favor, showed that Brinkman committed a negligent act while he was on duty, just like he did the same thing all the other Jaycees did. And he was furthering, there was evidence that he was at least in part furthering the business of the Jaycees. And there's absolutely no reason to disturb this verdict. I thank you and appreciate your cooperation. Thank you. Mr. Conflin. Let's see if I can do this in one breath. I agree, Your Honor, that a reprimand does not equal an instruction not to hug. But be that as it may, if there had been a 213 disclosure, as simple as we intend to question Nona Valicente about the policies and procedures of the Crystal Lake Jaycees that encourage physical conduct or physical contact as part of the job, no one would have filed a motion to keep out Nona Valicente's instructions to him not to engage in physical contact. And I think part of the confusion here is that being a poor server, and that's kind of where your questions come in, being a poor or a server does not alert anyone there will be physical contact. It's just not part of the job. If you look at the plaintiff's brief, the plaintiff cites the Sinceri case and the Marcus v. Milestone case, and Marcus is a 2nd District 2004 case. In both of those cases, the appellate court, one we're dealing with a bouncer and one we're dealing with a caregiver in a nursing home. And while Morris is just a 615 motion, the court's observation was that some jobs require physical contact with the employer's customers or clientele. A poor server does not require physical contact with anyone. Number two, when you get to the issue of whether this hug was a personal hug or a J.C.'s hug, you're left with nothing but speculation. Valicente said there's no written policy on hugging or instructing members to hug that's on R213. Some J.C.'s hug one another, some don't, R213, 214. Some go their entire life just shaking hands or saying hi, R214. No one is instructed to hug anyone for the purpose of recruiting, R214. Mr. Brinkman never said to anyone one word that this hug was somehow motivated. So, you know, there was no pre-meeting pep talk where she instructed anybody to hug or to recruit. She just, it's like the old saying, negligence in the air is insufficient. Apparently recruiting is in the air of the Crystal Lake J.C.'s, and that's going to make every single thing a person does part and parcel of being a Crystal Lake J.C. I don't think the law goes that far, Your Honor. I think... Is that a reasonable inference the jury can make, though, based on the evidence? I don't think so. The cases on circumstantial evidence say that in circumstantial evidence, there has to be one conclusion more probable than all the others. And while they talked about the fact that the Crystal Lake J.C.'s encourage all this camaraderie, it may be with hugging, it may not be with hugging. So how do we tell about this hug? If some J.C.'s go their entire life with a shake of a hand and no one is required to hug, how do we tell that this instance was a J.C. hug? And the fact of the matter is, you just simply can't. There's no... That was our discussion in the first session about, at least in the Sheehan case, you had some actual fact testimony from the actual person who's the alleged agent that would allow us to reach some conclusion. The only conclusion that we're allowed to reach is speculation as to what may or may not have been going on in Brinkman's head, even if you accept all of the testimony in light most favorable to the plaintiff. So thank you very much. Thank you. All right, thank you, counsel, for your argument today. Thank you for your allowing us to be a bit late.